ROBERT J. JONES v. THE STATE.

No. 7711.   Decided May 30, 1923.

1.—Murder—Bill of Exceptions—Practice on Appeal.

This court has uniformly held that after the expiration of the time allowed by statute, or by some proper order of the trial court for filing statement of facts and bills of exception, and after the adjournment of the term, the trial judge has no power to then enter a legal order granting further extension of such time for filing such documents.

2.—Same—Insufficiency of the Evidence.

    Where, upon trial of murder by administering poison, to-wit; bichloride
of mercury with intent to kill in that defendant inserted and placed said
poison into the vagina of the deceased so that of said poison she became
mortally sick and died, there was no evidence in the record on appeal to
support the theory that defendant administered the poison to the deceased
with malice or intent to kill her, but that the same was probably self-ad-
ministered, the judgment must be reversed and the cause remanded.

    Appeal from the District Court of Galveston.  Tried below before
the Honorable Robt. G. Street.
    Appeal from a conviction of murder; penalty, twenty years im-
prisonment in the penitentiary.
    The opinion states the case.

    *McDonald & Wayman,* for appellant.—On the question of the
absence of malice, Bailey v. State, 144 S. W. Rep., 996; Haley v.
State, 138 id., 631; Grant v. State, 143 id., 929.

    *R. G. Storey,* Assistant Attorney General, and *F. Spencer Stubbs,*
Assistant County Attorney, for the State.

    LATTIMORE, JUDGE.—Appellant was convicted in the District
Court of Galveston County of murder, and his punishment fixed at
twenty years in the penitentiary.
    We cannot consider appellant's bills of exception because filed
too late.  Since Griffin v. State, 59 Texas Crim. Rep. 424, decided in
1910, this court has uniformly held that after the expiration of the
time allowed by statute, or by some proper order of the trial court,
for filing statement of facts and bills of exception, and after the ad-
journment of the term, the judge has no power to then enter a legal
order granting further extension of such time for filing such docu-
ments.
    This is a very remarkable case.  The indictment charged that on
September 14, 1921, appellant with malice aforethought killed and
murdered Hazel Cheverere ''by administering poison, to-wit: bichlor-
ide of mercury with intent to kill in that he inserted and placed said
poison into the vagina of deceased and private parts of deceased so
that of said poison she became mortally sick and died.''  That a
bichloride of mercury tablet was inserted into the vagina of the
young woman on said night resulting in her death a week later, is
without dispute in the record.
    Three possible theories arise: that appellant inserted the tablet
into the private arts of deceased with intent to kill her as plead by the
State,—that he inserted same with intent to prevent conception as a
result of intercourse between them,—and that she inserted same for
the purpose of such prevention.

Appellant had been an inmate of the boarding house of the mother of deceased. She was a young woman of twenty-two and assisted in the work of said boarding house, waiting on the table, looking after the rooms, etc. The State admits that appellant had taken her out in his car on at least one occasion prior to the night in question. Appellant's theory is that he had taken her out on a number of occasions and they were and had been criminally intimate.

There being no question of the fact that death was caused by the use of the bichloride tablet, the State's case as showing the guilty agency and connection of appellant with such death rested mainly upon the testimony of the girl's mother and a dying declaration given in evidence by the county attorney of Galveston County. The mother of the young woman said that on the morning of September 15, 1921, a Mrs. Hotopp came to her house in a car and took her to the Sealy Hospital in Galveston where she found her daughter suffering so intensely as to be unable to talk to her either at that visit or upon another made later during the day. That that night the girl did talk to her and told her not to worry about her, that she was dying, that she did not have much to say but that "Jones done it all." Witness asked her how he did it and she said "God only knows." Witness said "Hazel, was there no way for you to get away, was there no way for you to save yourself at all?" and deceased replied, "No, he had a pistol and I had no way to get away. Don't worry about me. I am dying, and I am dying fast." The county attorney testified that on September 22, 1921, at seven minutes after nine o'clock P. M. he took from the deceased the following dying declaration:

"My name is Hazel Cheverere. I have no chance to get well. Mr. Robt. J. Jones did this to me. I want to go home. Mr. Jones took me in an automobile. I want to die home. Mr. Jones took me on the beach and we got some near beer. I don't know where we drank it. I did not want to drink at first but he made me. He said he had a pistol and poison. So I drank some as I was afraid. He put something hard in my private parts and it hurt me very bad. He put his privates into my privates and grabbed me and forced me. That happened in the automobile. I screamed and told him to take me home, and he took me to the house of a woman named Mrs. Hotopp. I told him to tell Mrs. Hotopp to phone to mama. I don't know if they did. Mrs. Hotopp told him to take me to the hospital and I said I would die before I got there. He put some kind of a pill into my privates. I did not give him my consent to put his privates in me. He said he had a pistol and poison and I was afraid. The Mr. Jones who did this thing to me used to live at my mama's house. I don't know how or when I got to the hospital. I feel bad and I want to go home, as I am going to die there; that is where I want to die. It was on a Wednesday night. (Down below this a line is drawn, and the following appears: 'Sept. 22-1921. 9:07 P. M.)." Her

death occurred at 6 P. M. the next morning. From the testimony
of Dr. Cooke it appears that the man who came with deceased to the
hospital on the night in question said to him in the course of a con-
versation about deceased in which witness told him that they would
probably be able to prolong her life for a week or more but there
was no chance for recovery, "Why let her live that long if there is
not a chance for her to live: Why take the trouble? Why not let
her go on and die. If she is going to die any way, why not let her die
quickly." On cross-examination this witness modified to some extent
this statement which he claimed had been made to him by the man
who came with deceased to said hospital. This is the substance of the
State's case.

For the appellant Mrs. Hotopp testified that some time prior to
the night in question deceased came to witness' store and wanted her
to go to a near-by drugstore and get for her some tablets and that
upon her declining because she was busy, deceased asked if witness'
little daughter could go and upon an affirmatively reply, wrote on a
piece of paper the name of what she wanted and gave the child some
money. The child returned from her errand presently and reported
that the druggist declined to let her have the tablets desired because
they were poisonous, that he would not hand them out to children
Deceased took the money back from the child and said she would get
them herself. This witness testified that a few days prior to that
time she had a conversation with deceased in which the latter asked
her for some tablets, telling her that he was going to be married. This
witness also testified to an occurrence a year or more prior to the
death of deceased in which she had requested deceased at her house
one day to get for her some headache tablets and when deceased
came with tablets she had antiseptic tablets which witness knew
were poisonous and she told deceased that these tablets were used for
dissolving in water and putting on cuts and things of that kind, to
which deceased replied "You are a sly one, you need not talk like
that. I know what they are for." This witness testified that on the
night of the 14th of September, the date in question, about 12 o'clock
deceased came to her house with appellant and seemed to be in great
trouble; that when she was admitted to the house she said, "I am
sick; let me in," and threw herself on the bed and said "I am dying."
Witness asked her what was the matter, why she came in there at
12 o'clock and to explain, and deceased said there was nothing to be
told, there was plenty to be seen. Witness tried to relieve the suffer-
ing of deceased and tried to make her go to her mother's home, which
she did not want to do. At the request of deceased she telephoned
for a doctor and he told her to tell deceased to go to the hospital.
While at the residence of witness deceased asked for some hot water
and a syringe and went with appellant into the kitchen of witness
and remained in there for a few minutes, stating that she believed

if she had some hot water and a syringe she could probably get some of the stuff out of her. Being unable to get relief, deceased went away with appellant to the hospital. Not long after she left deceased called up from the hosiptal and wanted witness to get a Dr. Fisher for her. While deceased was at witness' house she asked her, "Hazel, what in the world did you do anyhow." Deceased replied, "Well, I just did use something that I didn't know how, and that is how it all came about." Witness further testified that next morning at the hospital she had a conversation with deceased in which she asked her, "Hazel, what did you use," and she said "Some tablets," and said she inserted them instead of doing what she probably should have done,—put them in water. The ten year old daughter of this witness was introduced for the defense and corroborated her mother as to the occurrence of the deceased sending her to a drugstore after some tablets which the druggist refused to let her have because they were poisonous. Miss Lucy Woods testified that she was a student nurse at the Sealy Hospital on the night of September 14th when deceased was brought in there suffering from bichloride poisoning. It was a part of her duties to get the history of the case and she asked deceased what was the matter with her and what the trouble was and deceased told her that she had used Diamond tablets, antiseptic tablets, that she had inserted them and told witness where she had inserted them and that this was the affected part. This witness testified that a man who came with deceased to the hospital, looked about like appellant, though she could not identify him; that he stayed ten or fifteen minutes at that time and came back later in the night to ask about deceased. Witness further testified that she asked deceased if this gentleman with her was her husband and she said that he was not, that he was a friend of hers and lived in Houston. She told witness that she used a tablet because she did not want to become pregnant; that she had been advised to use them. Dr. Littlefield for the defense testified that he was instructor in the department of Anatomy in the Medical College at Galveston and was a student in that institution in September, 1921, and that he saw deceased at the hospital that night, she having been brought there under the name of Mary Smith. He asked her what was the matter with her and she replied that she had used a Diamond tablet. Witness said the Diamond tablet was patented by Eli Lilly & Co. and was an antiseptic tablet composed of bichloride of mercury. Witness gathered from her conversation that some one had told her that it would be all right to use them. When witness attempted to pursue the question as to why she used the tablet, she became obstinate and would not talk, and when he insisted she said "Why do people usually use them?" At this time deceased was suffering, the external genitals being swollen the size of a man's two fists. Witness further testified that the introduction of bichloride of mercury tablets into the vagina would cause acute

Bright's disease. Miss Hawkins for appellant testified that she was a trained nurse and was on duty in the Sealy Hospital on the night of September 14th when deceased was brought to said institution suffering from mercurial poisoning. That there was a man with her who looked like appellant, though she could not positively recognize him. Witness talked to deceased and asked her what was the matter with her and she replied that she had introduced an antiseptic tablet into her vagina. That she called the tablet a Lilly tablet. Deceased said she wanted to go home and she talked to some one over the telephone, though witness did not hear what she said. When deceased came in on the occasion in question she had hold of the arm of a man who came with her and that he remained close by her all the time he was there. She asked the man what was the matter with deceased and he replied that she could tell witness what was the matter better than he could. Appellant testified narrating fully and in detail his intimacy with deceased and that on former occasions prior to the night in question he had used rubber protectors and that on this occasion she volunteered to use some tablets which she said she had gotten and which were better than rubbers, and that immediately after she had inserted a tablet she began to complain of intense burning pains and that he did what he could, dipping his handkerchief in the water of the radiator of the car and giving it to her to try to remove the substance, and then later that he carried her to the home of Mrs. Hotopp at her request. He testified to what occurred at the home of Mrs. Hotopp substantially as that witness did, stating that while there she used a syringe and hot water in an effort to relieve the pain. He testified that he then carried her to the hosptal and made arrangements for her to stay and paid for the first night and promised to pay for the remainder of the time. He said that he was unable to sleep that night and remained in and around the hospital and that the next morning he went to the house of Mrs. Hotopp and let her have his car to take the mother of deceased to the hospital. He further testified that he was back at the hospital several times and that finally deceased told him he had better go on home and not let her mother or brothers know anything about this connection with the unfortunate occurrence. He said that he did return home to Alvin, a town between Houston and Galveston, and that he received an offer of work in San Antonio and went to that town with his wife and three children and remained for some days, learning of the death of deceased while there. He further testified that he then went to Oklahoma with his wife and children where he secured work, and that he was later arrested and brought back to Galveston and charged with this crime. He testified that during the period of his friendship and intimacy with deceased he received letters and telegrams from her and gave her presents. A witness who rode in his car with appellant testified that on one occasion he got out of the car and went to some place and that

he picked up a letter which had fallen out of the pocket of appellant and read it and that it was from Galveston and signed Hazel and referred to some present which the writer had received from appellant and expressed her hope that he would return to Galveston soon.

This is the substance of the testimony. We are unable to persuade ourselves to believe that the State has made out a case of murder against this appellant, or that there is such evidence in this record to support the theory that appellant administered the poison to the deceased with malice or intent to kill her which would justify this court in good conscience in permitting this conviction to stand. There is not a suggestion of ill-will or malice toward deceased on the part of appellant anywhere in the record, but the contrary appears. It seems impossible to believe that he used the poison upon her in the face of the testimony of so many disinterested witnesses relating conduct on the part of appellant indicating every effort to aid deceased and every interest in caring for her and her recovery, and showing so many statements by her that she herself placed the tablet in her privates. Pretermitting a discussion of the possibility of his inserting without her consent into her vagina a tablet such as the one in question, it would seem to stagger credulity to claim that if he did so insert it, his purpose was to kill her. Why such purpose? She had done him no wrong! In the statement made by the unfortunate young woman on the night of her death, which is quoted above, she says that he put something hard into her private parts and it hurt her very bad, that he put his privates into her privates and grabbed her and forced her, that he said he had a pistol and poison and she was afraid. She says that she screamed and told him to take her home and that he took her to the house of Mrs. Hotopp and that she told him to tell Mrs. Hotopp to phone for her mother, and that Mrs. Hotopp told him to take her to the hospital. This narration made by one approaching dissolution itself appears utterly inconsistent with what reason and experience would indicate to be the likely course of conduct of one who had by force ravished a girl. Not only does it bear marks of inconsistency within itself but it is completely at variance with all the testimony given by the disinterested witnesses. Without exception these all say that she appeared on terms of perfect friendliness with appellant, who was aiding and assisting her by all means within his power. That she told all of them that she herself inserted the tablet and that her purpose was the same as that of others who used them, to prevent conception.

If appellant had purposed to kill deceased it would not seem likely that he would have brought her, while perfectly conscious and able to report what had occurred, to the home of a woman whom he had never seen, and then take her to a hospital and surrender her to the care and ministration of doctors and nurses over whom he had no control and to whom her immediate relation of mistreatment if any would seem probable.

It is easy to understand how a jury of good citizens would feel resentment at the course of conduct of a man with a wife and children who would become intimate with a single woman and by persuasiôn and appeal induce her to surrender herself to his lust, and that this might affect their judgment of his case. It is not difficult to understand that one who by possession and use of an automobile had taken a young woman out at night and probably led her astray from the path of virtue, might have trouble in obtaining justice at the hands of a jury of good men considering this course of conduct. The young woman was dead, and her unfortunate death resulted from a condition for which appellant was in a sense responsible. She had doubtless conceived an affection for him which led her to yeld her person to him and to such an extent as to necessitate the use of some agency to prevent that which might naturally follow this relationship. The testimony of her mother and the statements contained in her dying declarations were doubtless regarded as sufficient upon which to predicate the conclusion that appellant administered to her the poison which caused her death, but our belief from a careful survey of the entire record is not only that such conclusion is against the great weight of the testimony, but that it has no such support therein as calls upon us to uphold the verdict.

Believing that this record shows a case devoid of that character of testimony which must appear before a citizen should be deprived of his liberty and incarcerated in the penitentiary, we feel it incumbent upon us to reverse the judgment and remand the cause, and it is so ordered.

*Reversed and remanded.*